Order Form (01/2005)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 04 C 50321 | **DATE** | 3/29/2005 |
| **CASE TITLE** | | Gibson vs. Barnhart | |

**DOCKET ENTRY TEXT:**

For the reasons stated on the attached Memorandum Opinion and Order, the ALJ's decision to deny benefits to Plaintiff is remanded for a new hearing consistent with this opinion and the mandates of SSR 83-20. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is granted in part. Defendant's Motion for Summary Judgment is denied.

■ [ For further detail see attached order.]

Notices mailed by judge's staff.

| | Courtroom Deputy Initials: | AM |
|---|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| SARAH L. GIBSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 04 C 50321 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| JOANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Sarah Gibson ("Plaintiff") seeks judicial review of the final decision of the

Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§

405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for

Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act, 42 U.S.C.

§ 416, 423. This matter is before the Magistrate Judge pursuant to consents filed by both parties

on October 22, 2004. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.


I.    **BACKGROUND**

Plaintiff filed for DIB on September 7, 2001 (Tr. 62), and her application for benefits was

denied on October 31, 2001. (Tr. 32). Plaintiff filed a request for reconsideration on November

8, 2001 (Tr. 36), but the Administration affirmed the previous decision denying Plaintiff benefits

on January 8, 2002. (Tr. 37). Plaintiff filed a request for a hearing before an Administrative

Law Judge ("ALJ") on January 21, 2002. (Tr. 41). Plaintiff was granted a hearing before ALJ

Edward B. Pappert on March 31, 2003. (Tr. 52). Plaintiff appeared, with counsel, before the

ALJ on April 23, 2003. (Tr. 533). In a decision dated February 12, 2004, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 15-29). The Appeals Council denied Plaintiff's request for review on March 26, 2004, making this case ripe for review. (Tr. 6).

## II.   FACTS

Plaintiff was born on December 2, 1959, making her approximately forty-four years of age at the time of her April 23, 2003, hearing before the ALJ. (Tr. 62). Plaintiff completed high school and some college credits. (Tr. 543). At the time of her hearing, Plaintiff lived at home with her husband. (Tr. 108, 332). Plaintiff claims disability since August 1, 1999, due to diabetes mellitus, diabetic retinopathy, hand nerve damage, and a heart condition. (Tr. 15).

Plaintiff was insured for benefits through September 30, 2000. (Tr. 28). Plaintiff had no reported income after May, 1996. (Tr. 540). Plaintiff worked as a sales clerk from October, 1995, to May, 1996, at Sears. (Tr. 80). Plaintiff worked part-time and was paid five dollars and fifty cents per hour for her services. (*Id.*). Plaintiff also worked full-time as a sales clerk from December, 1984, to January, 1989. (*Id.*).

Plaintiff worked part-time as an assistant for a brokerage firm from September, 1993, to May, 1994. (*Id.*). Plaintiff worked at a rate of seven dollars and fifty cents per hour. (*Id.*). Plaintiff also worked as a credit reporter from February, 1992, to October, 1992, at a rate of six dollars and fifty cents per hour. (*Id.*).

Since leaving work, Plaintiff stated she stayed around the house during her typical day. (Tr. 545). Plaintiff reported she was able to do some chores, but she could not shop on her own or do the laundry. (Tr. 545-46). Plaintiff also stated in her disability benefits application that she had trouble holding small objects like a toothbrush or comb. (Tr. 90). Finally, Plaintiff

2

stated she was not able to drive for about a year prior to her hearing. (Tr. 543).

At her hearing, Plaintiff discussed her August, 1999, foot infection, which she claims led to her disability. (Tr. 541, 544). Plaintiff stated the infection caused nerve damage in her left foot that made it difficult for her to walk. (*Id.*). Plaintiff testified that she used a rented wheelchair to get out of the house since August, 1999, but stated she did not get her own wheelchair until December, 2001. (*Id.*). To get around in her house, Plaintiff used a walker. (Tr. 542). Plaintiff reported that her husband helped her do things like get to and from vehicles and shopping. (Tr. 543). Plaintiff further stated that she needed to wear an IV antibiotic pump for three months after her foot was infected, so she sat on the couch for most of that time. (Tr. 544). Plaintiff also stated she tried to walk on a treadmill for five minutes at a time once a day. (Tr. 551).

Plaintiff testified about other medical problems related to her diabetes, like her kidney disease. (*Id.*). Plaintiff noted her diabetes also caused some visual difficulties by decreasing her peripheral vision and causing cataracts. (Tr. 547). At the time of her hearing, Plaintiff stated she took sugars four times a day, and insulin shots two to four times a day. (Tr. 548). Plaintiff stated she only took two insulin shots per day in April, 2000. (*Id.*). Plaintiff stated she was required to elevate her legs for several hours a day. (Tr. 549).

At the time of Plaintiff's hearing, she took several prescription medications, including 20 milligrams of Lisinopril[1] once a day, 40 milligrams of Isosorbide Dinitrate SR[2] twice a day, and 50 milligrams of Lopressor twice a day for hypertension. (Tr. 97). Plaintiff also represented that

---

[1]Indicated for treatment of hypertension, heart failure, and myocardial infarction. PHYSICIAN'S DESK REFERENCE (59th Ed. 2124).

[2]Indicated for the treatment of angina attacks. PHYSICIAN'S DESK REFERENCE (59th Ed. 3081).

3

she used drugs such as Lipitor, Zantac, Furosemide, Lopid for cholesterol, Humalog Insulin for diabetes, Metocolpramide, Nexium for acid reflux, Vioxx for arthritis, and Timoptic for Glaucoma. (Tr. 96, 103).

Vocational Expert ("VE"), Mr. Christopher Yep, testifying before the ALJ, stated that Plaintiff's past work as a sales clerk was unskilled, light work, and Plaintiff's past work as a brokerage assistant was classified as semi-skilled, light work. (Tr.554). Plaintiff's past work as a credit reporter was semi-skilled, sedentary work. (*Id.*). The ALJ stated he would not propose any hypotheticals to the VE. (Tr. 554).

### III. <u>MEDICAL HISTORY</u>

Plaintiff's earliest medical records before this court are stress tests related to Plaintiff's coronary artery disease (CAD). Plaintiff underwent a Thallium exercise stress test on January 2, 1991, which was consistent with her past history of right coronary disease. (Tr. 233). On December 4, 1992, Plaintiff underwent a Persantine stress test. (Tr. 230). A moderate to large posterior wall defect with partial marginal reperfusion was detected along with a small anterior wall fixed nontransmural defect. (*Id.*).

Plaintiff's next records date several years later, when she began to see Dr. Seal for her diabetes and heart condition in 1994. Dr. Seal noted that Plaintiff had a heart attack in 1988, and had been on high dose anti-anginal blood pressure medication since then. (Tr. 126). Plaintiff underwent angioplasty in May, 1988, with a 70% LAD stenosis. (Tr. 233). On March 31, 1994, Dr. Seal reported that Plaintiff's cholesterol was elevated and that her glycosolated hemoglobin was above normal. (Tr. 129). Dr. Seal indicated more aggressive insulin management was

4

needed. (*Id.*). In May, 1994, Dr. Seal stated Plaintiff had no cardiac problems, but did have slight lability of blood sugars, so he increased her insulin dose. (*Id.*).

On June 22, 1994, Plaintiff saw Dr. Seal for a check-up on her diabetes, hypertension, and heart disease. (Tr. 128). Plaintiff was doing well and had no complaints. (*Id.*). Her diabetes was recorded as only somewhat controlled, but her hypertension and heart disease were controlled. (*Id.*). Plaintiff was switched to 70/30 insulin. (*Id.*).

Plaintiff had laser eye surgery on her right eye in July, 1994, and on her left eye in September, 1996. (Tr. 156, 174). On August 5, 1998, during a follow-up ophthalmic examination, Plaintiff said she had no complaints. (Tr. 305). The opthamalogist indicated that Plaintiff's peripheral diabetic retinopathy was stable, and noted she had early mild cataracts. (*Id.*).

Plaintiff saw Dr. Seal on August 24, 1994. (Tr. 127). Plaintiff was doing well on 70/30 insulin. (*Id.*). Plaintiff also noted slight angina with heavy exertion, but stated it cleared promptly with decreasing the level of activity. (*Id.*). Dr. Seal began to slowly taper Plaintiff's beta blockers to a lower dosage. (*Id.*).

On November 9, 1994, Plaintiff saw Dr. Seal due to high blood sugars. (Tr. 126). Plaintiff also reported some angina, but no congestive heart failure symptoms. (*Id.*). On January 17, 1995, Plaintiff reported orthostatic dizziness to Dr. Seal. (*Id.*). Plaintiff's blood sugars were down with the higher dose insulin prescribed in November. (*Id.*). Plaintiff denied any angina. (*Id.*).

Plaintiff saw Dr. Seal on February 15, 1995. (Tr. 125). Dr. Seal noted that Plaintiff's diabetes and heart disease were controlled, but diagnosed a URI with otitis complications. (*Id.*). On May 22, 1995, Plaintiff was doing well, except for leg cramping. (*Id.*).

5

Plaintiff saw Dr. Seal on August 23, 1995. (Tr. 123). Dr. Seal stated Plaintiff was doing reasonably well, except for occasional low sugar reactions. (*Id*.). Dr. Seal continued Plaintiff on Lisinopril, insulin, and Reglan. (*Id*.). On October 17, 1995, Dr. Seal opined that Plaintiff's hypertension was over treated, but her heart disease and diabetes was stable. (*Id*.).

On October 20, 1995, Plaintiff was seen by Dr. McCullough at an Orthopedic and Fracture clinic due to shoulder pain. (Tr. 115). Plaintiff's records indicated that she had been previously diagnosed with frozen shoulder syndrome. (*Id*.). Dr. McCullough noted that Plaintiff was insulin-dependent and using 110 units daily. (*Id*.). Direct examination revealed substantial limitation of the left shoulder, and Plaintiff had difficulty raising her hand above her head. (*Id*.). The doctor diagnosed left frozen shoulder syndrome and subdeltoid bursitis of the right shoulder. (*Id*.). He injected Plaintiff's right shoulder with Xylocaine-triamcinolone, and Plaintiff had excellent relief. (*Id*.). Exercises and physical therapy were recommended to help Plaintiff's left shoulder. (*Id*.).

Plaintiff saw Dr. Seal on November 20, 1995. (Tr. 122). Plaintiff's diabetes was somewhat controlled, her hypertension was controlled, and her heart disease was somewhat controlled. (*Id*.).

Plaintiff was again examined by Dr. Seal on May 1, 1996. (Tr. 121). Dr. Seal reported that Plaintiff's blood sugars were in the low 100's and that no major hypoglycemic episodes or break through angina had occurred. (*Id*.). Dr. Seal opined that Plaintiff's Type I diabetes was somewhat controlled and that her hypertension and heart disease were well controlled on multiple medications. (*Id*.). On February 6, 1996, Dr. Seal reported that Plaintiff was doing well except for a lingering URI. (Tr. 122).

6

Plaintiff saw Dr. Herbert Knight for her diabetes and heart condition as early as February, 1997. (Tr. 383). She continued to see Dr. Knight through November, 1998. (Tr. 291). Dr. Knight's records are difficult to decipher, but it appears that Plaintiff developed angina around November, 1996, and experienced discomfort and fatigue. (Tr. 371). Plaintiff was still experiencing exertional chest pressure in June, 1997. (Tr. 364). Plaintiff's doctor recommended increased activity and cardiac rehabilitation. (Tr. 363). Plaintiff started cardiac rehabilitation in August, 1997. (Tr. 347). Plaintiff complained of dizziness after walking on a treadmill in September, 1997, but her CAD was noted as stable. (Tr. 339). In October, 1997, Plaintiff was evaluated for suspected pituitary adenoma, but no macroadenoma or identifiable microadenoma was found with a MRI exam. (Tr. 331). Plaintiff felt fine on January 29, 1998 (Tr. 321), and she reported doing well on March 13, 1998. (Tr. 314). In August, 1998, Plaintiff reported very little angina, and the doctor noted her CAD was stable. (Tr. 302). Plaintiff had mild edema on her legs. (*Id.*). Plaintiff felt fine August 24, 1998. (Tr. 300).

On November 4, 1998, ophthalmologist Edgar Levine noted that Plaintiff had peripheral diabetic retinopathy, pseudophakia, and primary open angle glaucoma, but he also noted that each condition was stable with medication. (Tr. 292).

On January 6, 1999, Plaintiff reported at the cardiology clinic that she was doing fairly well, with some occasional episodes of chest discomfort. (Tr. 287). The doctor noted stable CAD and Class II symptoms. (*Id.*). Plaintiff also told Dr. Knight she felt fine on June 15, 1999, but she noted occasional pain over her right eye on July 2, 1999. (Tr. 283, 280).

On August 8, 1999, Plaintiff was hospitalized for a rash and pain in her left heel.[3] (Tr. 264). Plaintiff also had a fever. (*Id.*). Physicians Krause and Kenney diagnosed cellulitis (acute

---

[3]Plaintiff alleges disability since August 1, 1999. (Tr. 15).

inflammation of the connective tissue of the skin caused by bacterial infection) and acute renal insufficiency. (*Id*.). Plaintiff's discharge records, dated August 25, 1999, indicated that Plaintiff's cellulitis was improved and her renal failure resolved. (Tr. 263). Plaintiff's foot was doing better August 31, 1999. (Tr. 275). Two weeks of antibiotics were prescribed September 8, 1999. (Tr. 271). Reports indicated that Plaintiff's wounds continued to improve slowly on September 27, 1999. (Tr. 270). Plaintiff's foot was debrided October 6, 1999, and a protective shoe was prescribed. (Tr. 266). Wounds were healing nicely on October 14, 1999. (Tr. 265). Plaintiff was released from infectious diseases services on October 21, 1999, and referred to vascular for treatment of edema because Plaintiff's foot discolored when she stood on it. (Tr. 261, 265).

On November 1, 1999, Plaintiff reported to Dr. Robert Miller a new foot wound, and tests were run November 11, 1999. (Tr. 259). On November 17, 1999, Dr. Miller reported that Plaintiff had 3 to 4+ pitting edema[4] on her left foot and ankle. (Tr. 257). The doctor noted no apparent diabetic neuropathy, but did note peripheral vascular disease secondary to diabetes. (*Id*.). Dr. Miller prescribed calf-high compression stockings. (*Id*.). Plaintiff had follow-ups in January and March of 2000 for ingrown toenail removal. (Tr. 251, 244).

On December 28, 1999, Dr. Edgar Levine noted during Plaintiff's eye exam that her retinopathy and pseudophakia were still stable. (Tr. 254). Plaintiff's corrected vision was 20/25 in each eye. (*Id*.).

---

[4]Pitting edema occurs when fluid collects in the tissue. By pressing firmly against the tissue for a few seconds, a dent can be produced that may persist for several minutes.

On June 23, 2000, Dr. David Mitchell met with Plaintiff to establish medical care. (Tr. 408). After reviewing Plaintiff's medical history, he noted that Plaintiff had diabetic retinopathy and acid reflux maintained on Zantac and Reglan. (Tr. 407). Plaintiff stated she had diabetes since age five. (*Id.*). Dr. Mitchell reported that Plaintiff had cushingoid features. (*Id.*). Plaintiff's vibratory sense was intact at the feet. (*Id.*). Plaintiff had no edema. (*Id.*). Plaintiff stated she tried to exercise on a treadmill daily. (Tr. 408). Plaintiff reported occasional migraines. (*Id.*). Plaintiff stated she had a vitrectomy and cataract surgery on her left eye in the past, but was currently stable. (*Id.*). Dr. Mitchell diagnosed Type I diabetes, CAD, hypertension (under control), hyperlipidemia, osteoarthritis of the knees and feet, migraine headaches, and glaucoma. (Tr. 406).

Plaintiff visited Dr. Mitchell on November 3, 2000. (Tr. 404). Plaintiff's cholesterol was high, but her hypertension was satisfactorily controlled. (*Id.*). Dr. Mitchell diagnosed CAD, osteoarthritis of knees and feet, tension headaches, glaucoma and diabetic retinopathy. (*Id.*). Plaintiff's blood sugars were stable. (Tr. 405). Plaintiff had no edema or lesions on her feet. (*Id.*). Dr. Mitchell prescribed Fioricet for Plaintiff's headaches and instructed her to resume taking Lipitor. (Tr. 404).

In February, 2001, Plaintiff saw Dr. Mitchell for a check-up. (Tr. 402). Plaintiff's hypertension was under control, but her cholesterol was high. (*Id.*). No angina or cardiac symptoms were reported. (Tr. 403). Plaintiff had some cushingoid features caused by an excess of the cortisol hormone. (*Id.*). Plaintiff was seen by Dr. Mitchell on March 14, 2001, due to tearing at her right eye. (Tr. 401). Dr. Mitchell diagnosed conjunctivitis of the right eye and prescribed TobraDex drops. (*Id.*).

On May 10, 2001, Dr. Mitchell noted that Plaintiff continued to have exertional chest pains. (Tr. 400). Plaintiff reported that she did not do much exercise due to problems with her knees, ankles, and feet. (*Id.*). Plaintiff continued with her medications. (*Id.*).

On September 19, 2001, Plaintiff saw Dr. Naseer, an endocrinologist, who diagnosed Type I diabetes mellitus, diabetic retinopathy, diabetic neuropathy, hyperlipidemia, and hypertension. (Tr. 429-30). Dr. Naseer adjusted some of Plaintiff's medications. (*Id.*). Plaintiff complained of difficulty with walking because of arthritic pain and swelling in her feet. (*Id.*). Dr. Naseer diagnosed 1-2+ edema. (*Id.*). Plaintiff denied hyperglycemia symptoms at her November 14, 2001, follow-up with Dr. Naseer. (Tr. 424). Plaintiff's liver function was normal. (*Id.*). Plaintiff's blood sugars were all high. (*Id.*).

On September 25, 2001, Plaintiff was seen by Dr. Mitchell for a chest X-ray. (Tr. 392). Dr. Mitchell reported no changes from Plaintiff's August 10, 2001, exam and noted that Plaintiff's chest remained negative for acute disease. (*Id.*). Plaintiff's August exam revealed a subtle lingular atelectasis or infiltrate. (Tr. 394). At Plaintiff's August visit with Dr. Mitchell, Plaintiff reported no angina or congestive heart failure. (Tr. 397). Plaintiff did relate to Dr. Mitchell that she was hospitalized while in Kentucky visiting her mother. (Tr. 398). Apparently, she swallowed the divider in her pill container, which lodged in her vocal cords and required surgical removal. (*Id.*). Plaintiff's surgery was complicated by pulmonary edema and pneumonia. (*Id.*). Plaintiff reported to Dr. Mitchell that she was back to normal after this ordeal. (*Id.*). Plaintiff reported taking Humulin, Lasix, Lopressor, Zestril, Zantac, Reglan, Lipitor, Ecotrin, and Timoptic eye drops. (*Id.*). Dr. Mitchell noted mild hypoalgesia (decreased sensitivity to painful stimuli) at Plaintiff's feet. (*Id.*). He diagnosed Plaintiff with osteoarthritis

of the knees and feet, hypercholesterolemia, hypertension (satisfactorily controlled), atherosclerotic coronary artery disease (with mild chest discomfort with exertion), and Type I diabetes. (*Id.*).

A state agency physician completed a Residual Functional Capacity Assessment ("RFC") on October 23, 2001. (Tr. 439). The doctor reported that Plaintiff could occasionally lift/push/pull twenty pounds, frequently lift ten pounds, and stand/walk/sit for a total of six hours each in an eight hour workday with normal breaks. (Tr. 440). The doctor also noted no postural, manipulative, visual, or communicative limitations. (Tr. 441-45). Finally, the doctor indicated that Plaintiff's date last insured was September 30, 2000, and opined that Plaintiff had the capacity to do light work prior to September 30, 2000. (Tr. 446). The doctor relied on Plaintiff's medical records, including the following: (1) February, 2000, eye exam that indicated her vision was 20/25 and her retinopathy was stable; (2) November, 2000, report that indicated Plaintiff's blood sugars were under control and that no cardiac symptoms were present; (3) June, 2000, report indicating no cardiac symptoms, stable blood sugars, and mild osteoarthritis. (*Id.*).

Dr. Karol Rosner saw Plaintiff on November 12, 2001, regarding Plaintiff's renal insufficiency and proteinuria secondary to diabetic nephropathy. (Tr. 471). Plaintiff stated she felt well since her last visit with Rosner in August, but stated she was concerned about an elevated heart rate at night. (*Id.*). Plaintiff denied chest pain or dizziness. (*Id.*). Plaintiff had trace edema. (*Id.*). Dr. Rosner continued Plaintiff on her medications, adjusted her Lopressor, and referred her to a dietician. (Tr. 472).

On November 15, 2001, Plaintiff saw Dr. Mitchell for a check-up. (Tr. 473). Plaintiff reported no chest pain or cardiac symptoms. (*Id.*). Plaintiff reported that Dr. Naseer was

adjusting her insulin. (*Id.*). Plaintiff's fundi showed stable retinopathy. (*Id.*). Plaintiff had trace edema and mild hypoalgesia of the feet. (*Id.*).

Another state agency physician, Dr. William Conroy, completed a RFC assessment for Plaintiff on December 26, 2001. (Tr. 431-38). This assessment also reviewed Dr. Naseer's records received December 17, 2001. (Tr. 438). Dr. Conroy reported that Plaintiff could occasionally lift/push/pull twenty pounds, frequently lift ten pounds, and stand/walk/sit for a total of six hours each in an eight hour workday with normal breaks. (Tr. 432). The doctor also noted no postural, manipulative, visual, or communicative limitations. (Tr. 433-37). Finally, the doctor indicated that Plaintiff's date last insured was September 30, 2000, and that Plaintiff was capable of performing a full range of light work activity prior to that date. (Tr. 438).

On December 27, 2001, Plaintiff returned to see Dr. Naseer for a follow-up. (Tr. 476). Plaintiff complained of occasional chest pains, but no dizziness. (*Id.*). Plaintiff's heart rate and rhythm were regular. (*Id.*). Plaintiff's cholesterol was 196. (*Id.*). Her diabetic retinopathy and neuropathy were stable. (*Id.*). Plaintiff's CAD and hypertension were also stable. (Tr. 477).

Plaintiff was seen at the Rockford Clinic for neck pain on February 7, 2002. (Tr. 486). Plaintiff's X-rays were normal and there were no radicular symptoms. (Tr. 487). Dr. Mitchell prescribed Vicodin and physical therapy. (*Id.*).

On February 28, 2002, Dr. Naseer reported that Plaintiff's CAD was stable with no chest pain or shortness of breath. (Tr. 493). Plaintiff reported no hypoglycemic symptoms. (*Id.*). Her triglyceride level was high, but her heart rate was regular. (*Id.*). Dr. Naseer increased Plaintiff's Lopid dosage to twice a day to decrease triglyceride levels. (*Id.*).

Plaintiff was seen by Dr. Mitchell for a follow-up on March 8, 2002. (Tr. 501). Plaintiff continued to report neck pain and spasm. (*Id.*). Dr. Mitchell re-filled Plaintiff's Vicodin and scheduled an MRI, which was performed March 14, 2002. (Tr. 505). Dr. Mitchell's impression was abnormal prevertebral soft tissues and suspected bone destruction at the anterior margins of C2 and C3. (*Id.*). Dr. Mitchell advised a CT scan, which was performed March 19, 2002. (Tr. 507). CT results also showed abnormal prevertebral soft tissues and suspected bone destruction. (Tr. 508). Bone Imaging of March 25, 2002, revealed increase of radiotracer uptake indicative of renal failure, changes of osteoarthritis, a right kidney somewhat small in size, and no abnormal cervical spinal activity. (Tr. 510).

On May 21, 2002, Plaintiff was admitted to St. Anthony Medical Center after suffering respiratory arrest. (Tr. 527). She was transferred to University of Wisconsin Hospital. (*Id.*). Plaintiff's medical history included a notation of her diminished ability to ambulate without a wheelchair for any significant time period since her severe cellulitis of the left lower extremity. (*Id.*). Plaintiff was discharged in good condition on June 25, 2002. (Tr. 520). Her discharge report diagnosed Type I diabetes, respiratory failure, pneumonia, epidural abscess, drug rash, renal insufficiency, candidal infection of groin, anemia, and esophageal perforation (probably resolved). (*Id.*).

## IV.     STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however, is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh

13

the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000); *Rohan v. Charter*, 98 F.3d 966, 971 (7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata*, 988 F.2d 473, 487 (7th Cir. 1993); *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994); *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.   **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied his application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C); *see also Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[5] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a)(b). Substantial gainful activity is work that

---

[5]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. *See* 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[6] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

_____

[6]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. *See, e.g.*, 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

17

## VI.   ANALYSIS

The court will proceed through the five step analysis in order.

### A.   Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since she alleged disability. (Tr. 28). The finding of the ALJ as to Step One of the analysis is not challenged by either party, and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the analysis is affirmed.

### B.   Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two analysis, the ALJ found Plaintiff suffered from severe impairments based on the requirements in 20 C.F.R. §404.1520(b), specifically diabetes mellitus and diabetic retinopathy. (Tr. 28, 18). This finding is not challenged by either party, and the court finds no reason to disturb it. Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. The ALJ's finding as to Step Two of the analysis is affirmed.

### C.   Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three, the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in the Listing of Impairments, C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 28, 24). In particular, the ALJ found that Plaintiff did not meet the requirements of Listing 9.08, diabetes mellitus. (Tr. 24). In support of this finding, the ALJ stated that "Plaintiff's treating and examining physicians have not said Plaintiff has an impairment that meets or equals the severity of any listed impairment." (*Id.*).

18

Neither party challenges the ALJ's finding under Step Three. As substantial evidence exists to support the ALJ's Step Three finding, this court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the analysis is affirmed.

## D.    Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff was capable of performing her past relevant work as a credit reporter, on or prior to September 30, 2000, when her disability insured status expired. (Tr. 27). While the ALJ found that Plaintiff was "currently disabled due to her inability to ambulate without the use of a wheelchair, walker or two hand-held assistive devices," the ALJ opined that the objective medical evidence did not indicate that Plaintiff was so limited prior to the date she was last insured for DIB. (Tr. 25). Though the ALJ noted that Plaintiff had mild to moderate pain/discomfort and significant limitations on her ability to perform basic work activities on or prior to September 30, 2000, he ultimately determined that Plaintiff retained the residual functional capacity (RFC) for the full range of sedentary exertional work[7] on or prior to September 30, 2000. (Tr. 26).

Plaintiff raises a number of issues challenging the ALJ's Step Four finding, but one issue raised by Plaintiff, the ALJ's disability onset date determination, is dispositive.

---

[7]    Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

Specifically, Plaintiff argues that the ALJ's decision was not in accordance with Social Security Regulation 83-20 ("SSR 83-20") because the ALJ's failure to specify an onset date leaves the ALJ's reasoning shy of substantial evidence. (Pl.'s Mem., at 5). Defendant maintains that the ALJ was not required to determine an exact date of disability onset. Rather, Defendant argues that substantial evidence exists to support the ALJ's finding that Plaintiff retained the RFC for the full range of sedentary work through September 30, 2000, when her DIB insured status expired. Thus, Plaintiff could never become eligible for DIB, and any finding of an exact onset date would serve no purpose. (Def.'s Mem., at 11). Defendant also argues the SSR 83-20 was not triggered because the ALJ did not make an explicit or "formal" finding that Plaintiff became disabled after September 30, 2000. *Id.*

SSR 83-20 pertains to the determination of the onset date of disability once a claimant has been determined to be disabled. *Lichter v. Bowen*, 814 F.2d 430, 434 (7th Cir. 1987). When an alleged disability is non-traumatic in origin, SSR 83-20 requires the ALJ to consider three main factors in choosing an onset date: (1) the claimant's allegations, (2) the claimant's work history, and (3) the claimants's medical or other relevant evidence. *Id.* SSR 83-20 describes the selection of an onset date as "essential" and mandates that the date be correctly established and supported by the evidence. SSR 83-20 also states that *"the expiration of insured status is not itself a consideration in determining when disability first began."* SSR 83-20 (emphasis added).

Under SSR 83-20, the starting point in determining an onset date is the claimant's statement as to when disability began. *Id.* This date should be used if it consistent with the evidence. *Id.* The date the claimant stopped work is also "frequently of great significance in selecting the proper onset date." *Id.* Finally, medical reports are the "primary element" in onset

20

date determination. *Id.* However, with slowly progressing impairments, it is "sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling." *Id.* Then, it is necessary to "infer the onset date." *Id.* An impairment need not reach listing severity before onset can be inferred. *Id.* The onset date inference must have a legitimate medical basis, and the ALJ "should call on the services of a medical advisor when onset must be inferred." *Id.* The onset date "should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA. . . . Convincing rational must be given for the date selected." *Id.*

In this case, the ALJ did not choose an onset date because he instead found Plaintiff not disabled before her date last insured, September 30, 2000. Specifically, the ALJ stated, "although the claimant is currently disabled due to her inability to ambulate without the use of a wheelchair, walker or two hand-held assistive devices, the objective medical evidence in this case does not indicate that she was so limited on or prior to September 30, 2000, the date she was last insured for Disability Insurance Benefits." (Tr. 16).

Plaintiff testified at her hearing that she used a wheelchair since her August, 1999, hospitalization for an infection in her foot. (Tr. 17). She testified that nerve damage in her foot after her infection caused her not to be able to "get very far on it." (Tr. 540). With a walker, Plaintiff testified she could walk twenty or thirty feet. (Tr. 542). Plaintiff stated she rented a wheelchair when she lived in Virginia Beach between April, 1999, and June, 2000. (Tr. 541). Between June, 2000, and December, 2001, when Plaintiff purchased her own wheelchair,[8] Plaintiff testified that she used electric carts in stores or her walker. (Tr. 552).

---

[8]The ALJ's opinion mistakenly reports that Plaintiff said she purchased her own wheelchair in December, 1999. (Tr. 17).

At Plaintiff's hearing, the ALJ questioned Plaintiff about the lack of references to her use of a wheelchair in her medical records. (Tr. 551). Plaintiff stated she went to her medical appointments in her wheelchair. (Tr. 548). The ALJ stated it was unusual not to see a notation about a wheelchair, especially in records of first visits with a doctor, like the first time Plaintiff saw Dr. Mitchell in June, 2000. (*Id.*). Plaintiff stated she did not know why her records did not reference her wheelchair. (Tr. 551). The ALJ did not reference this discussion in his opinion.

Other than commenting on Plaintiff's wheelchair use, the ALJ gave no further indication (at Plaintiff's hearing or in his opinion) of when he believed Plaintiff became disabled, even though he did find Plaintiff to be disabled at the time of her hearing. It may be that the ALJ did not find Plaintiff disabled until December, 2001, when Plaintiff first purchased a wheelchair, but this is not clear. Instead of addressing this issue in his opinion, the ALJ skipped over the reasoning behind his decision, and laid out evidence in support of his position that Plaintiff was not disabled prior to September, 2000. (Tr. 25). Primarily, the ALJ pointed out that there was no indication in Plaintiff's medical records that Plaintiff used a wheelchair or other assistive device.

It may be that the ALJ correctly found Plaintiff not disabled before her insured status expired, but the real issue at hand is whether the ALJ was required to follow the procedures for choosing an onset date mandated by SSR 83-20. At first glance, it may seem futile for an ALJ to formulate a specific onset date when the ALJ has already determined that the date would be outside of the date last insured. However, a careful review of the case law and SSR 83-20, itself, shows otherwise, especially in cases of slowly progressing disabilities of non-traumatic origin.

In *Campbell v. Chater*, the court considered the "type of affirmative finding of disability by the ALJ [] necessary to trigger SR 83-20's procedures for finding the onset date of disability."

22

932 F. Supp. 1072 (N.D. Ill. 1996). The *Campbell* court faced facts quite similar to the facts presented in this case. As in the case at hand, the ALJ stated during the claimant's hearing that he would have awarded benefits if the issue had been one of current disability, but the ALJ did not do so based on the claimant's date last insured. *Id.* at 1074. The ALJ also did not select an onset date because he opined it would be beyond Campbell's insured status. *Id.*

In evaluating Campbell's case, the court found it had no other choice but to remand the ALJ's decision for a new hearing consistent with the guidelines set out in SSR 83-20. *Id.* at 1080. In reaching its conclusion, the court stated that:

> SSR 83-20 is a directive to the ALJ as to the operative ground rules and procedure that must be followed where a claimant is or has been disabled and where the claim necessitates a determination of the onset date of that disability, the only precondition to the ALJ's resort to SSR 83-20 should be the fact that the ALJ has found such disability–and not the particular manner in which the ALJ has articulated that finding.

*Id.* at 1077. In this case, Defendant also maintains that SSR 83-20 was not triggered because there was no *formal* finding of disability. However, because a claimant cannot avail herself of the procedures set forth in SSR 83-20 to show disability before her insured status expired (unless the ALJ first finds the claimant disabled at a later time), the *Campbell* court found that a requirement of a *formal* finding of disability would "read[] SSR 83-20 out of existence for claimants such as Campbell." *Id. See also Quarles v. Barnhart*, 178 F.Supp.2d 1089, 1097-98 (N.D. Cal. 2001); *Gullett v. Chater*, 973 F. Supp. 614, 623-24 (E.D. Tex. 1997); *Garland v. Barnhart*, 2004 WL 413302, at *3-4 (D. Me. 2004).

The *Campbell* court also recognized that SSR 83-20 was meant to aid judges in making the difficult determination of an onset date in the context of progressive impairments, and found that it did not make sense for SSR 83-20's helpful procedures to be ignored in cases where the onset date may have occurred after a claimant's insured status expired. *Id.* at 1078.

This court agrees that medical evidence need not establish that Plaintiff was disabled on or prior to September 30, 2000, to trigger SSR 83-20. Instead, this court finds the correct analysis, in cases where the medical evidence indicates a claimant was disabled from a slowly progressing impairment, is for the court to inquire whether the medical evidence is ambiguous as to whether the onset of the disability was on or before the claimant's last insured date. Applying this method of analysis to the case at hand, the court finds the ALJ should have turned to SSR 83-20 for guidance in determining whether the onset date of Plaintiff's disability was before September 30, 2000.

The record is ambiguous as to whether the onset of Plaintiff's disability occurred on or before September 30, 2000. The only thing more ambiguous is the ALJ's rationale for finding Plaintiff not disabled before September 30, 2000. Perhaps, the court could follow the ALJ's logic if some fact or medical record after September 30, 2000, clearly caused the onset of Plaintiff's disability, but no such distinguishing fact suggests itself to the court, nor did the ALJ identify such an event in his opinion.

Even if Plaintiff's use of a wheelchair or an assistive device is the crucial point of disability, there is no logical bridge built by the ALJ to reach this conclusion. There is no indication in the medical record of when this event occurred. At some point it surely did, as the ALJ noted that Plaintiff was unable to ambulate without the used of wheelchair or assistive

device at her hearing. While the ALJ points to several instances in the medical record where there was no mention of Plaintiff's need to use an assistive device (Tr. 25-26), the ALJ does not point to when the record did reflect that Plaintiff used a wheelchair or assistive device. The court was only able to find such a reference in Plaintiff's May, 2002, records of her stay at the University of Wisconsin Hospital. There, the doctor who completed her medical history indicated "[s]tatus post severe cellulitis of the left lower extremity from residual deficits in the left lower extremity, which diminishes her ability to walk and requires wheelchair for any significant periods of ambulation." (Tr. 527). Plaintiff's bout with cellulitis, occurred in April, 1999, when Plaintiff also alleges disability onset. (Tr. 264). Thus, the only reference to Plaintiff's use of a wheelchair is actually consistent with Plaintiff's allegations. The ALJ did not reference any of Plaintiff's medical records beyond March 25, 2002, in his opinion, so it is not clear that the ALJ even reviewed Plaintiff's May, 2002, hospitalization records.

Further, Plaintiff has the type of slowly progressing impairments that SSR 83-20 was promulgated to address. Plaintiff's physical limitations correspond to her regular and continuous medical treatment for diabetes, CAD, osteoarthritis, and other diabetes related medical conditions. How long Plaintiff's condition existed at a disabling level of severity is unclear. Thus, an onset date had to be inferred by the ALJ. In making this inference, it became the ALJ's burden to select the most reasonable date from which one could conclude that Plaintiff's impairment was sufficiently severe to prevent Plaintiff from engaging in SGA. Moreover, it was the ALJ's burden to provide a convincing rationale for the date selected. SSR 83-20. In this case, the ALJ avoided considering all of the evidence needed to select an onset date by finding

Plaintiff was not disabled before her date last insured. Fatally, the ALJ did not select an onset date and did not build a logical bridge to his conclusion that no such determination was needed.

Because the ALJ improperly failed to follow SSR 83-20 and also failed to render a decision supported by substantial evidence in the record, the ALJ's finding as to Step Four of the Analysis is remanded for a new hearing consistent with this opinion and the mandates of SSR 83-20.

## VII. CONCLUSION

For the foregoing reasons, the ALJ's decision to deny benefits to Plaintiff is remanded for a new hearing consistent with this opinion and the mandates of SSR 83-20. Plaintiff's Motion for Summary Judgment on the administrative record and pleadings is granted in part. Defendant's Motion for Summary Judgment is denied.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 3/28/05